# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

James Aulick,

      Plaintiff,

v.

Skybridge Americas, Inc.,

      Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 14-4862 ADM/HB

_____

Thomas E. Marshall, Esq., Engelmeier & Umanah, P.A., Minneapolis, MN, on behalf of
Plaintiff.

Ryan R. Kuhlmann, Esq., Chamberlain Law Firm, Wayzata, MN, on behalf of Defendant.
_____

## I.  INTRODUCTION

On March 11, 2016, the undersigned United States District Judge heard oral argument on
Defendant Skybridge Americas, Inc.'s ("Skybridge") Motion for Summary Judgment [Docket
No. 17] and Plaintiff James Aulick's Motion to Strike [Docket No. 33].  Aulick asserts claims
against his former employer for age discrimination, violations of 29 U.S.C. § 626, promissory
estoppel, fraud, and negligent misrepresentation.  For the reasons set forth below, Skybridge's
motion for summary judgment is granted and Aulick's motion to strike is denied as moot.

## II.  BACKGROUND

Aulick was 63 years old in 2013 when his former employer, Skybridge, chose a 50-year
old external candidate for an executive position rather than choosing to promote him.  The next
month, Aulick's position was eliminated and he was terminated.  Aulick filed this action alleging
age discrimination and other claims.  Skybridge moves for summary judgment on all claims.

**A. Aulick's Employment with Skybridge and its Predecessor**

Skybridge is a retail order business with facilities in the United States and Canada.  Pl.'s Mem. Opp'n Summ. J. [Docket No. 25] at 2.  Aulick began working for Skybridge in mid-2011, when Skybridge acquired two business divisions from Aulick's former employer, Argenbright, Inc. ("Argenbright").  Morris Decl. [Docket No. 20] ¶¶ 2–3.  The business divisions purchased by Skybridge were:  (1) a call center business; and (2) a warehouse and distribution business of order fulfillment.  Id. ¶ 3.  Skybridge was created for the purpose of purchasing the two business divisions.  Marshall Aff. [Docket No. 26] Ex. C ("Morris Dep.") at 14:10–15:13.  At the time Skybridge purchased the businesses, the call center business employed approximately 700 employees and accounted for more than 75% of Skybridge's revenue, while the fulfillment business employed less than 50 employees and accounted for less than 25% of the revenue. Morris Decl. ¶ 3.

Prior to the acquisition, Aulick had worked as senior director of information technology ("IT") for Argenbright's fulfillment division.  Id.  He did not have experience in the call center business.  Id. ¶ 9.  Aulick began with Argenbright in 2008, left in 2009 because he disagreed with decisions his boss was making, and resumed working for Argenbright again in 2010 as an independent contractor.  Marshall Aff. Ex. A ("Aulick Dep.") 25:22–26:9; 28:14–29:1.

While working as a contractor, Aulick was assigned to repair Argenbright's strained relationship with its second largest fulfillment client, Four Corners.  Id. 32:19–33:5; 38:5–12; Ex. 2.  Aulick's work with Four Corners was successful and his supervisor told him he had saved the company.  Id. 39:10–20.  In May 2011, shortly before the acquisition by Skybridge, Aulick resumed working for Argenbright as an employee.  Id.  35:5–6.

2

In or around July 2011, Skybridge purchased the call center and fulfillment divisions and hired Aulick as Senior IT Director.  Id. Ex. A.  Aulick entered into an at-will employment agreement with Skybridge on July 12, 2011.  Id.  At the time he was hired by Skybridge, Aulick was 61 years old.

**B.  Changes to Skybridge's Executive Team**

Following the acquisition, Skybridge's sole shareholder and Chairman, Mark Morris, age 61,[1] began replacing Skybridge's executive team.  Morris Dep. 5:2–3; 23:12–33.  Morris recruited Kevin Cattoor, 57, to be Skybridge's CFO and later its CEO.  Morris Decl. ¶ 7.  From December 2012 to September 2013, Morris hired five more executive-level employees to replace existing management personnel.  Cattoor Decl. [Docket No. 21] ¶ 17.  Of the six new executive-level employees hired by Morris, three were 57 or older, one was 50, one 47 and one 35.  Id. ¶¶ 17–18.  Morris also asked Michael Paxton, 65, if he would serve as the sole member of Skybridge's advisory board.  Marshall Aff. Ex. F ("Paxton Dep.") at 9:3–10.

**C.  Cattoor's September 2012 Assessment of Aulick's Management Abilities**

When Cattoor first began with Skybridge, he evaluated the company's performance and identified strategies for improvement.  Cattoor Decl. ¶¶ 2–3; Morris Decl. ¶ 7; Morris Dep. 26:20–27:6.  On September 19, 2012, Cattoor provided the executive committee with a memorandum summarizing his assessment of the fulfillment division.  See Morris Decl. Ex. B. With respect to the fulfillment division's management team, Cattoor reported that "IT

---

[1] Unless otherwise noted, all ages specified are the age of the individual at the time of the event, rather than the individual's current age.

management is not optimum."  Id. at 7.[2]  Cattoor wrote that Aulick was "not capable of leading IT projects," had not effectively established priorities and work plans, and did not communicate plans or project updates to those involved with the projects.  Id. at 11.  Cattoor further stated that he had "numerous discussions" with Aulick about his ability to lead the IT department for the fulfillment business, and that the discussions had "focused on prioritization of IT projects, communication to the team and demonstrating leadership; and doing so with a sense of urgency."  Id. at 17.  Cattoor concluded his assessment of Aulick by stating:  "We need to continue working with [Aulick] to overcome his shortcomings.  At the same time we should be exploring other alternatives for management of IT."  Id.

**D.  Aulick Expresses Intent to Leave Skybridge Due to Outdated Technology**

During his employment with Skybridge, Aulick recommended several innovations to enhance the fulfillment division, including replacing outdated infrastructure, in particular the warehouse management system.  Aulick Dep. 39, 41–43; Morris Dep. 28:2–29:5, Exs. 1, 12; Aulick Decl. [Docket No. 27] ¶¶ 3–4.  Aulick considered Skybridge's IT to be underfunded and understaffed.  Id. ¶ 4.

In October 2012, Aulick informed Cattoor that he would start looking for another position outside the company if Skybridge was not interested in investing in technology.  Id.  Aulick told Cattoor that if the infrastructure issues could change, he would remain with Skybridge until he retired.  Id.  Cattoor relayed this conversation to Morris, who commented that it would be "unfortunate" if Aulick left because Skybridge was still in the process of evaluating

---

[2] The page numbers cited for Exhibit B to the Morris Declaration refer to the page numbers assigned by the Electronic Court Filing ("ECF") system.

the needs of the IT department and had not yet made final decisions regarding who would be assigned various roles within the department.  Morris Dep. 68:24–70:4; 81:14–20.

In December 2012, Aulick began searching for jobs in Atlanta, Georgia, where his wife had accepted a new position.  Aulick Decl. ¶ 5.  Aulick learned of several opportunities and attended some interviews but did not receive any job offers.  Id.

**E.  Additional Problems with Four Corners**

Also in December 2012, the relationship between Skybridge and Four Corners once again became strained due to interaction problems between the two companies' IT infrastructures. Morris Decl. 52:19–23.  Aulick was again assigned to handle the issue.  Aulick Decl. ¶ 6.

**F.  Brady Audit**

In March 2013, Skybridge hired an independent third party consultant, David Brady of Brady Consulting, to perform a company-wide IT evaluation and provide his recommendations. Morris Decl. ¶ 8.  Skybridge paid $17,000 for Brady's services.  Id.  In conducting his review, Brady met multiple times with Aulick, who provided him with information and shared his ideas for improving IT.  Aulick Dep. 56:8–57:4.  Brady asked if Aulick's wife would move back to Minnesota if Aulick was offered the head position in a restructured IT department at Skybridge. Aulick responded, "yes."  Aulick Decl. ¶ 7.

Upon completing his evaluation, Brady presented a report of his findings to senior management.  Morris Dep. 58:18–15; Morris Dep. Ex. 10 ("Brady Report").  Brady's report recommended combining the separate IT functions for Skybridge's call center and fulfillment divisions.  Morris Decl. ¶ 8; Brady Report at 40.  Brady also recommended creating a new position of Chief Technology Officer ("CTO") to oversee the centralized IT department.  Morris

Decl. ¶ 9; Brady Report at 41.  Brady advised that Aulick was a "strategic thinker" and the best internal candidate for the CTO position, but recommended that the company also consider external candidates.  Morris Decl. ¶ 11; Morris Dep. 70:16–24; Cattoor Dep. 54.  After he presented his report, Skybridge asked Brady if he would be interested in the CTO position, but he declined.  Cattoor Dep. 54; Morris Decl. ¶ 11.

## G.  Cattoor, Turner Discuss CTO Position with Aulick

Shortly after Brady presented his report, Cattoor and John Turner, Vice President of Fulfillment, had a meeting with Aulick.  Aulick Dep. 61:8–12.  Cattoor discussed the results of Brady's report with Aulick and told him the two IT divisions would be combined into a single unit headed by a CTO.  Aulick Decl. ¶ 8.  Aulick was informed that Brady had been offered the CTO position but had declined.  Aulick Dep. 63:22–64:8.  Cattoor also told Aulick that Brady had identified Aulick as the only current Skybridge employee capable of performing the new CTO position.  Id. at 63; Cattoor Dep. 52, 55, 65.  Cattoor asked Aulick if he was willing to apply for the position.  Id. at 70.  When Aulick responded that he was, Cattoor said, "Good.  I'd be disappointed if you weren't."  Id.  Aulick claims that Cattoor also told him, "The job is yours to lose.  You've got the inside track.  Mark [Morris] really likes you."  Aulick Dep. 69.  Cattoor denies telling Aulick that he had the inside track or that the job was his to lose, but he admits that he encouraged Aulick to apply for the CTO position.  Cattoor Dep. 64–65.

It is undisputed that during this conversation, Cattoor told Aulick, "You're not guaranteed to get this position."  Aulick Dep. 70:6–7.  Cattoor also informed Aulick that the application process for the CTO position would begin soon and that the position would be posted externally but not internally.  Id. 62:11–12, 63:3–15.  The salary and start date were not

discussed.  Id. at 70:22–71:1.  Based on Cattoor's comments during this meeting, Aulick was left

with the impression that he had a "good chance" of getting the CTO position.  Id. at 69:12–13.

**H.  Aulick Terminates His External Job Search**

As a result of the meeting with Cattoor and Turner, Aulick stopped submitting new

applications for jobs outside the company but did not withdraw any of his pending applications.

Soon after the meeting, Cattoor asked Aulick if he had stopped his job search.  Id. 95:5–7.  When

Aulick told him he had, Cattoor said, "Good."  Id. 95:6–8.  Aulick testifies that Cattoor's

response "kind of sealed the deal on that" and caused him to contact recruiters and inform them

he was "pulling out because it looks like I have a position."  Id. 95:8–12.

**I.  Aulick Interviews with Cattoor for CTO Position**

In mid-April 2013, approximately two weeks after Aulick's meeting with Cattoor and

Turner, Cattoor formally interviewed Aulick.  Cattoor Dep. 57, 59.  The interview lasted two and

one half hours and focused on Aulick's resume and accomplishments.  Aulick Decl. ¶ 9.  Aulick

was informed that he would have a future interview with Morris and that he would likely also

interview with Paxton, who was the sole member of Skybridge's advisory board.  Aulick Dep.

72:13–14.  The salary and start date for the position were not discussed in the interview.  Id.

71:22–72:3.  Aulick has testified that it would have been "premature to talk about salary and

start date until you have a decision or you're trying to convince somebody of it."  Id. 72:3–5.

A number of weeks after Aulick's interview, Cattoor met with him to provide an update

on the status of the CTO position.  Id. 77:11–14.  Cattoor informed Aulick that his name "would

be one of the two that [Cattoor] would talk to Morris about."  Id. at 77:16–17.  Aulick

understood the "two names" comment to imply that Cattoor had interviewed another candidate

and that perhaps Morris was wanting to know more about the other candidate.  Id. at 78:24–79:2.

**J.  Four Corners Problems Resolved**

On May 17, 2013, Aulick informed Cattoor that he had resolved the IT interaction issues with Four Corners.  Aulick Dep. Ex. 34.  Cattoor thanked Aulick for his diligence on the project. Id.  Once the issues with Four Corners had been resolved, Aulick heard less frequently from Cattoor, which caused him concern about the status of his interviews with Morris and Paxton. Aulick Decl. ¶ 11.  Aulick assumed the lack of communication may have been because of Cattoor's frequent travel.  Id.

**K.  Skybridge Hires Whitmore for CTO Position**

Also in May 2013, Brady introduced Bruce Whitmore, then 50, to Skybridge as a possible candidate for the CTO position.  Morris Decl. ¶ 12; Marshall Aff. Ex. E ("Whitmore Dep.") 10:13–15, 11:3–8.  Brady and Whitmore were former co-workers and close friends. Whitmore Dep. 11:3–5, 13:3–7.  Whitmore was a former top-level IT manager at Carlson Companies, where he had most recently served as Senior Director of Infrastructure of the company's call center.  Morris Decl. ¶ 12; Whitmore Dep. 8:3–12.  Whitmore oversaw a global network with a $30 million IT budget, about the amount of Skybridge's total revenue.  Morris Decl. ¶ 12.

Whitmore was interviewed separately by Cattoor, Morris, and Paxton.  Id. ¶ 14; Paxton Dep. 34:8–10; Whitmore Dep. 14:9–15:8, 18:9–23.  During the interview with Cattoor, there was discussion about combining the fulfillment and call center business units, and Whitmore related his experience at Carlson Companies running both a fulfillment operation and a call center. Whitmore Dep. 22:1–9.  At the time Morris met with Whitmore, Aulick "was still in the mix" of

8

candidates for the CTO position.  Morris Dep. 78:2–13.  However, Paxton was not aware that Aulick was a candidate and never interviewed anyone other than Whitmore for the CTO position.  Paxton Dep. 34:8–19.

After Whitmore had completed his interviews, Cattoor, Paxton, Morris decided to hire him.  Morris Decl. ¶ 14.  Skybridge presented Whitmore with an offer of employment on or about June 7, 2013, and he accepted shortly thereafter.  Whitmore Dep. 25:15–27:9.

Aulick avers that after Whitmore was hired as CTO, Cattoor told him that Whitmore was selected because "the management team had a lot of conversation about Jim Aulick, but in the end, Mark [Morris] wanted a 'New Face.'"  Aulick Decl. ¶ 12.  Aulick contends that Cattoor repeated the "New Face" comment four times during their conversation.  Id.  Morris denies ever using the expression "New Face."  Morris Dep. 86:17–24.  During their conversation, Cattoor also asked Aulick whether he planned to leave the company.  Aulick Decl. ¶ 12.  Aulick replied, "no, I'm waiting to see what [Whitmore] has in mind and how we could work together."  Id.

The following week, Aulick met Whitmore and observed Whitmore's younger age, causing Aulick to conclude that Cattoor's "New Face" comments were related to Aulick's age.  Id.

**L.  Aulick Presents at June 2013 Strategic Forum Meeting, Works with Whitmore**

In June 2013, shortly before Whitmore's start date, Skybridge held a Strategic Forum meeting at which Aulick presented his ideas for a new warehouse management system.  Aulick Decl. ¶ 10.  After the meeting, Morris approached Aulick and stated that he was anxious to get started with the project.  Id.  On July 8, 2013, Morris sent Aulick an email stating, "I was able to take more time over the holiday to review your [warehouse management system] evaluation.

9

Nice work!  I am looking forward to moving this forward."  Morris Dep. Ex. 20.

After Whitmore started with Skybridge, he and Aulick discussed plans and strategies for improving Skybridge's technology.  Whitmore Dep. 39:1–24.  Aulick felt he got along well with Whitmore and was looking forward to working with him.  Aulick Dep. 81:6–21.

## M.  Aulick Terminated

On July 15, 2013, Cattoor notified Aulick that his position had been eliminated.  Cattoor Decl. ¶ 14.  Cattoor presented Aulick with a severance agreement offering 30 days' severance.  Aulick Decl. ¶ 17, Aulick Dep. 88–90, Ex. 15.  Aulick was told he had 15 days to review and sign the agreement.  Aulick Decl. ¶ 17.  This period was shortened to nine days when Skybridge's Human Resources Director called Aulick on July 24, 2013 and requested that he sign the agreement.  Id.  Aulick did not sign the severance agreement and has testified that he would not have signed it even if he had been given additional time.  Id.; Aulick Dep. 124:2–9.

The record is not clear as to who made the decision to terminate Aulick.  Morris testified that Whitmore evaluated his staffing needs and recommended that Aulick be let go.  Morris Dep. 82:19–2.  Cattoor similarly testified that the decision to terminate Aulick would have been made by Whitmore, as the person in charge of the IT department.  Cattoor Dep. 70, 73, 79–81.  However, Whitmore testified that he played no role in Aulick's dismissal, did not recommend that Aulick's position be eliminated, was surprised when Cattoor informed him that Aulick had been let go, and was given no explanation for why Aulick had been terminated.  Whitmore Dep. 41:11–23, 42:9–13, 42:18–20.

## N.  Other Employees Terminated

### 1.  Employees Over Age 60

In addition to Aulick, two other Skybridge employees over age 60 were terminated in late

10

June and mid-July of 2013. Skybridge informed its staff that those employees, Lino Swanick

and Debi Steinkraus, were terminated because their positions had been eliminated. See Morris

Dep. Exs. 22–23. The severance agreements for Swanick and Steinkraus state that their

positions were eliminated. Id. Exs. 21, 24. In addition to the termination of these employees,

Aulick avers that in February 2012, Skybridge terminated Dean Fitch, a 70-year old Skybridge

Vice President, and replaced him with Turner, who was nearly 20 years younger. Aulick Decl.

¶¶ 15–16.

### 2. Employees in IT Department

From mid-2013 to mid-2015, Skybridge reduced the size of its IT department from 19

employees (including Aulick) to 10 without losing a meaningful level of productivity. Morris

Decl. ¶ 18.

### O. Aulick Remains Unemployed

Following his termination, Aulick resumed his job search. Aulick Decl. ¶ 18. He has

been unable to find replacement employment in the 2 1/2 years since he was terminated from

Skybridge. Id. ¶ 19. According to Aulick, recruiters have little interest in him now that he is

unemployed, and he has received few interviews. Id. ¶¶ 18–19.

### P. Present Lawsuit

Aulick has filed this action alleging age discrimination, violations of 29 U.S.C. § 626,

promissory estoppel, fraud, and negligent misrepresentation. See generally Compl. [Docket No.

1]. He argues Skybridge discriminated against him based on his age, and also that Skybridge

falsely promised he would be promoted to CTO. Aulick contends Skybridge made the promise

of promotion to him to induce him to stay at Skybridge because he was essential to preserving

the company's relationship with its major client Four Corners. In reliance on Skybridge's

11

representations, Aulick alleges that he stopped his job search, causing him to lose potential opportunities that would otherwise have been available to him.  Skybridge denies the allegations and moves for summary judgment on all claims.

## III.  DISCUSSION

### A.  Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that summary judgment shall issue "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party and draws all justifiable inferences in its favor.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).  The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation omitted).

### B.  Age Discrimination (Count I)

Aulick alleges that Skybridge's adverse employment decisions were motivated by his age, in violation of the Minnesota Human Rights Act, Minn. Stat. § 363A.08, subd. 2 ("MHRA") and the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA").  Compl. ¶¶ 49–51.  Both the ADEA and MHRA prohibit discrimination against an employee based on age, and the court "analyzes the claims together, applying the same evidentiary framework."  Rahlf v. Mo-Tech Corp., 642 F.3d 633, 636 n.2 (8th Cir. 2011).  To establish age discrimination, a plaintiff may present either direct evidence of discrimination, or circumstantial evidence using

the McDonnell Douglas burden-shifting test.  Id. at 637; Hoover v. Norwest Private Mort.

Banking, 632 N.W.2d 534, 542 (Minn. 2001) (citing McDonnell Douglas Corp. v. Green, 411

U.S. 792, 802-04 (1973)).

### 1. Direct Evidence

Direct evidence is evidence of conduct or statements by the individual who made the

adverse employment decision, "show[ing] a specific link between a discriminatory bias and the

adverse employment action, sufficient to support a finding by a reasonable fact-finder that the

bias motivated the action."  Torgerson v. City of Rochester, 643 F.3d 1031, 1046 (8th Cir. 2011)

(en banc).  For example, statements such as "a woman can't handle" a particular job, or that

"women in sales were the worst thing to happen to the company," are examples of direct

evidence of gender discrimination.  Id. (citations and quotation omitted).  However, direct

evidence does not include facially and contextually neutral statements by decisionmakers, nor

does it include "stray remarks in the workplace, statements by nondecisionmakers, or statements

by decisionmakers unrelated to the decisional process."  Twymon v. Wells Fargo & Co. 462 F.3d

925, 934 (8th Cir. 2006) (internal quotations omitted); see also Hamblin v. Alliant Techsystems,

Inc., 636 N.W.2d 150, 154 (Minn. Ct. App. 2001).

Aulick argues that Cattoor's repeated statement that Morris was looking for a "new face"

is direct evidence of discrimination.  However, the statement is facially and contextually neutral.

No reasonable fact finder could conclude that the phrase "new face" referred to a younger

applicant, rather than to an external candidate who was "new" to the company.  Therefore, this

comment does not fall within the category of direct evidence of age discrimination.  Aulick

offers no other direct evidence suggesting that Skybridge's employment decision was based on

age.  Aulick cannot avoid summary judgment for Skybridge on this ground.

### 2. Circumstantial Evidence

Under the McDonnell Douglas test, a plaintiff must first present a prima facie case of discrimination. Rahlf, 642 F.3d at 637; see Tusing v. Des Moines Indep. Cmty. Sch. Dist., 639 F.3d 507, 515 (8th Cir. 2011) (upholding the continued applicability of McDonnell Douglas burden-shifting framework in light of Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009)).[3]  To establish a prima facie case of age discrimination based on circumstantial evidence, Aulick must show he:  (1) was at least forty years old at the time of his termination; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) was rejected for or replaced by someone sufficiently younger to permit the inference of age discrimination. Ramlet v. E.F. Johnson Co., 507 F.3d 1149, 1153 (8th Cir. 2007) (citing McGinnis v. Union Pac. R.R., 496 F.3d 868, 875 (8th Cir. 2007)).

The first three elements are easily satisfied.  Aulick was 63 at the time he was terminated, he was qualified for the CTO position, and he was not selected for that position and ultimately terminated.  As to the fourth element, the parties dispute whether the 13-year age difference between Aulick and Whitmore constitutes sufficient age disparity to permit the inference of discrimination.  The age difference of more than a dozen years is considerable, and the Court will assume for purposes of this summary judgment motion that a prima facie case of age discrimination has been established.

"Once the plaintiff has established a prima facie case, the burden shifts to the defendant

---

[3] Gross makes clear that the overall burden to prove age discrimination remains with the plaintiff, but the Eighth Circuit Court of Appeals has repeatedly found the McDonnell Douglas framework helpful in analyzing whether the plaintiff's circumstantial evidence makes a case of discrimination that should be sent to the jury.  See also Haigh v. Gelita USA, Inc., 632 F.3d 464, 468 (8th Cir. 2011).

to produce evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." <u>Girten v. McRentals, Inc.</u>, 337 F.3d 979, 981 (8th Cir. 2003) (internal quotations and alterations omitted).

Skybridge has articulated a legitimate, non-discriminatory reason for selecting Whitmore over Aulick for the CTO position. Whitmore's experience and qualifications were better tailored for the new CTO position than were Aulick's. Whitmore had experience with both call center and fulfillment businesses, compared to Aulick's experience with fulfillment only. Since fulfillment comprised only 25% of Skybridge's business, Aulick lacked experience in the department which accounted for at least 75% of Skybridge's business. In addition, Whitmore's experience included top-level IT management with Carlson Companies' large global network and a $30 million IT budget that exceeded Skybridge's company-wide budget. Whitmore's experience was better suited to Skybridge's business needs.

Skybridge has also articulated a legitimate, non-discriminatory reason for terminating Aulick. Upon acquiring the call center and fulfillment businesses from Argenbright, Skybridge implemented significant management changes and invested $17,000 for independent consultant Brady to perform a company-wide IT evaluation and provide recommendations. Based upon the recommendations offered in Brady's 45-page report, Skybridge determined that it should consolidate its two separate fulfillment and call center IT departments into one centralized department. After this restructuring, there was no longer a need to have an IT director for fulfillment only, and Aulick's position was eliminated.

Since Skybridge has offered legitimate, non-discriminatory reasons for its employment decisions, the burden shifts back to Aulick to show some proof that the reasons offered were pretext for intentional discrimination. <u>See</u> <u>Torgerson</u>, 643 F.3d at 1046. To show pretext,

[a] plaintiff may show that the employer's explanation is unworthy of credence because it has no basis in fact. Alternatively, a plaintiff may show pretext by persuading the court that a prohibited reason more likely motivated the employer. Either route amounts to showing that a prohibited reason, rather than the employer's stated reason, actually motivated the employer's action.

Id. at 1047 (citations and quotations omitted).

Aulick argues that Skybridge's reasons for hiring Whitmore and later terminating him are pretextual because the reasons have not previously been articulated, and because they contradict the record.  Aulick argues the interview process was a "predetermined sham" because Skybridge always intended to hire the significantly younger Whitmore and had already begun purging its older employees.  Pl.'s Mem. Opp'n Summ. J. at 26.  Aulick thus contends Skybridge never considered his superior education and experience, including his advanced business degree and his supervision of an IT department with over 70 employees.

Aulick's credentials are impressive.  However, the undisputed record shows that Whitmore was a better fit for the CTO position because he had substantial experience with both call center and fulfillment functions whereas Aulick had only fulfillment experience.  Because Whitmore's experience was better aligned with Skybridge's IT restructuring, no reasonable fact finder could conclude that Aulick was not promoted because of his age.  Although Aulick believes he was the more qualified candidate, "employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination.  Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 781 (8th Cir. 1995).

Further, the record does not support Aulick's contention that Skybridge management had always intended for the younger Whitmore to have the CTO position.  Whitmore was not even

16

introduced as a candidate to Skybridge until May 2013.  Although Morris and Paxton did not interview Aulick or review his resume before offering the job to Whitmore, this does not necessarily suggest the CTO application process was predetermined.  As an existing employee, Aulick's talents and credentials were already known to Skybridge.

Nor does the record support Aulick's argument that Skybridge was purging its older employees.  Although Skybridge terminated four employees over age 60 from mid-2011 to mid-2013, it also hired three employees who were 57 or older to fill key management positions.  By the time Skybridge had completed its changes to the executive team, more executive-level positions were held by employees within three years of age 60 than not.  See Cattoor Decl. ¶ 17.

Aulick also argues that because Cattoor and Morris have inconsistent versions of who made the decision to terminate him, this demonstrates pretext.  Cattoor and Morris initially testified in their depositions that Whitmore made the decision, but later submitted declarations stating that they oversaw the decision.  Even accepting Aulick's argument that Cattoor and Morris' testimony has shifted on the issue of who decided to terminate Aulick, the reason why he was terminated has remained constant.  The record consistently shows that Aulick's position was eliminated after Skybridge obtained independent advice from Brady for improving its IT department.  That advice, documented in Brady's report, included combining the company's two distinct IT departments into one centralized department, thereby eliminating the need for the fulfillment IT director position.

Therefore, Aulick has failed to submit evidence showing a genuine issue of material fact as to pretext.  Skybridge's employment decisions were based on its legitimate and documented business needs and were not the result of age discrimination.  Accordingly, Skybridge is entitled to summary judgment on the age discrimination claims.

**C.  Claim Under 29 U.S.C. § 626 (Count II)**

Aulick claims Skybridge willfully violated 29 U.S.C. § 626(f)(1) by giving him less than 15 days to consider the severance agreement and by failing to provide him with comparison information on the Skybridge employees who were also terminated and those who remained employed.  Compl. ¶¶ 55–58.

29 U.S.C. § 626(f)(1) governs the enforceability of an individual's waiver of a discrimination claim.  A waiver is not knowing and voluntary—and therefore not enforceable—unless it complies with the requirements of 29 U.S.C. § 626(f)(1), including the requirement that "the individual is given a period of at least 21 days within which to consider the agreement."  29 U.S.C. § 626(f)(1)(F)(I).  A waiver requested in connection with a group termination program is also not enforceable unless the employer informs the individual in writing as to "the job titles and ages of all individuals . . . selected for the program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program."  29 U.S.C. § 626(f)(1)(F)(ii).

Because Aulick did not waive his discrimination claim, these provisions are not relevant.  Aulick chose not to execute the severance agreement and never signed a waiver.  Aulick Dep. 123:20–22.  Therefore, the statutory provision governing waiver does not apply and Skybridge is entitled to summary judgment on this claim.

**D.  Promissory Estoppel (Count III)**

Aulick's claim for promissory estoppel is based on representations made by Skybridge executives that allegedly induced Aulick to end his external job search.  These representations include Cattoor's statements that:  (1) Cattoor would "be very disappointed" if Aulick did not apply for the CTO position; (2) the "job is yours to lose, and Mark [Morris] really likes you;" (3)

Brady had identified Aulick as the only Skybridge employee capable of performing the CTO position; and (4) if Cattoor "had to give Mark [Morris] two names today, yours would be one of them." Aulick Dep. 62:14–15; 70:8–9; 63:16–20; Aulick Decl. ¶ 10.

"To state a claim for promissory estoppel, the plaintiff must show that (1) there was a clear and definite promise, (2) the promisor intended to induce reliance and such reliance occurred, and (3) the promise must be enforced to prevent injustice." Park Nicollet Clinic v. Hamann, 808 N.W.2d 828, 834 (Minn. 2011).

Aulick's promissory estoppel claim fails because he has not offered evidence of the existence of a clear and definite promise that he would be given the CTO position. Significantly, Aulick admits that Cattoor told him, "You're not guaranteed to get this position." Aulick Dep. 70:7. Moreover, Aulick was also fully aware that he was one of two names being considered for the CTO position, that the position had been posted externally, and that Skybridge had previously offered the job to someone else. Moreover, a salary and start date for the position was never discussed with Aulick. Aulick's own deposition testimony shows that Cattoor's statements to him—that the job was Aulick's to lose, that he had the inside track, and that Morris really liked him—caused Aulick to think "there's a good chance of me getting this job." Id. 69:7–13 (emphasis added). A "good chance" of getting a job differs greatly from a clear and definite promise of a job. Therefore, Skybridge is entitled to summary judgment on Count III of the Complaint.

## E. Fraud/Intentional Misrepresentation (Count IV)

Aulick argues that Skybridge enticed him into abandoning his job search and remaining with the company by falsely representing it would promote him to the CTO position and would implement his IT recommendations. Aulick contends Skybridge already knew he had no future

with the company but nevertheless lied to him so he would stay and keep Skybridge's antiquated systems operational and its client relationships intact.

The elements of an intentional misrepresentation claim are that a defendant:

> (1) made a representation (2) that was false (3) having to do with a past or present fact (4) that is material (5) and susceptible of knowledge (6) that the representor knows to be false or is asserted without knowing whether the fact is true or false (7) with the intent to induce the other person to act (8) and the person in fact is induced to act (9) in reliance on the representation (10) that the plaintiff suffered damages (11) attributable to the misrepresentation.

M.H. v. Caritas Family Servs., 488 N.W.2d 282, 289 (Minn. 1992).

Central to Aulick's fraud claim is that "Skybridge duped him into staying with a false promise of promotion to CTO."  Pl.'s Mem. Opp'n Summ. J. at 31.  As discussed above, however, no such definite promise was made.  Aulick admits that CEO Cattoor specifically told him that he was not guaranteed to get the CTO position.

Aulick also argues that the representations were false because at the time they were made, Cattoor and Morris had already decided that Aulick would not be considered for the CTO position.  Aulick cites Cattoor's September 2012 assessment of Aulick's management abilities, in which Cattoor reported that Aulick was "not capable of leading IT projects," and that Skybridge "should be exploring other alternatives for management of IT."  Morris Decl. Ex. B at 11.

Even when viewed in the light most favorable to Aulick and giving him the benefit of all reasonable inferences, the record lacks evidence to support Aulick's contention that he was never considered for the CTO position.  Although the September 2012 assessment was critical of Aulick's management abilities, it stated an intent "to continue working with [Aulick] to overcome his shortcomings."  Id.  Additionally, when Morris and Cattoor were asked during

their depositions whether they had reached a conclusion in September 2012 that Aulick would

not be fit for the overall IT management role, Morris answered "No, not at this time," and

Cattoor answered, "No, not at this point."  Morris Dep. at 48:18–23; Cattoor Dep. at 37.  Aulick

admits that Cattoor met with him for a 2 1/2 hour interview in April 2013 during which Aulick's

resume, accomplishments, and the CTO position were discussed.  See Compl. ¶ 20.  Morris also

testified that at the time Whitmore was interviewing for the CTO position, "Aulick was still in

the mix."  Morris Dep. 78:7–13.  Thus, Aulick's contention that he was not considered for the

CTO position is founded upon speculation and ignores significant evidence to the contrary.  The

record does not support an inference that the representations by Skybridge were false when

made.

Aulick also cannot show that he justifiably relied on Cattoor's statements when deciding

to discontinue his search for other employment.  There is no evidence that Skybridge ever asked

Aulick to cease his job search.  Rather, Aulick chose to stop looking elsewhere even though he

had specifically been told that he was not guaranteed the promotion and that Skybridge would be

considering external candidates for the CTO position.

Aulick also argues that even after Whitmore had been hired, Skybridge induced Aulick to

remain with the company by falsely promising him that "his long sought recommendations to the

IT infrastructure were finally being adopted."  Id. at 31.  Specifically, at the end of the June 2013

Strategic Forum meeting, Morris told Aulick that Skybridge would be proceeding with the

warehouse management system ("WMS") project that Aulick presented at the meeting.  Aulick

Decl. ¶ 10.  Morris stated that he was anxious to get started with the project.  Id.  Morris further

stated in a July 8, 2013 email to Aulick, "I was able to take more time over the holiday to review

your WMS evaluation.  Nice work!  I am looking forward to moving this forward."  Morris Dep.

Ex. 20.  Aulick contends Morris' statement was false as the WMS project was later tabled and never moved forward.  Paxton Dep. 43:4; Cattoor Dep. 74.

Aulick has presented no evidence from which a reasonable juror could conclude that Morris' statements were made with the intent to induce Aulick to continue working for Skybridge and to prevent Aulick from resuming his job search.  It is not reasonable to infer that Morris would intentionally encourage Aulick as late as July 8 to stay on with Skybridge if the company was planning to terminate him on July 15.  See Piekarski v. Home Owners Sav. Bank, F.S.B., 956 F.2d 1484, 1494 (8th Cir. 1992) ("It is highly unlikely that Donley would encourage Piekarski to continue his employment at Home Owners when he wanted to fire him.").

Additionally, to the extent that Morris' statements may have led Aulick to believe his employment with the company would continue into the future, the statements directly contradicted Aulick's signed employment agreement which provides the employment is at will and that the terms of the agreement cannot be modified unless the parties agree to the change in writing.  See Morris Decl. Ex. A.  Accordingly, the terms of Aulick's at-will employment bar any finding of reliance.  See Hanks v. Hubbard Broad., Inc., 493 N.W.2d 302, 309 (Minn. Ct. App. 1992) ("[W]here an at-will employee merely continues to work and does not claim to have turned down any offers of employment based upon an employer's representations, no reliance will be found.").

Therefore, Aulick's fraud claim fails as a matter of law and Skybridge is entitled to summary judgment on Count IV.

**F.  Negligent Misrepresentation (Count V)**

Aulick also claims Skybridge is liable for negligent misrepresentation based on false information provided to him inducing him to stay with Skybridge and stop his job search.

22

To succeed on a negligent misrepresentation claim, a plaintiff must establish:  "(1) a duty of care owed by the defendant to the plaintiff; (2) the defendant supplies false information to the plaintiff; (3) justifiable reliance upon the information by the plaintiff; and (4) failure by the defendant to exercise reasonable care in communicating the information."  Williams v. Smith, 820 N.W.2d 807, 815 (Minn. 2012).

"[T]he existence of a duty of care is a threshold requirement.  Without it, liability cannot attach."  Id. at 816 (internal citation omitted).  Aulick, an at-will employee, cannot establish that Skybridge owed Aulick a legally recognized duty of care when discussing a potential promotion with him.  The imposition of a duty of care "is derived from the legal relationship between the parties and a determination that [a] plaintiff's interests are entitled to legal protection against [a] defendant's conduct."  Williams, 820 N.W.2d at 816.  Generally, a duty of care is only recognized for legal relationships that are fiduciary, advisory, or professional in nature, such as guardianships or attorney/client relationships, or for "special legal relationships in which one party has superior knowledge or expertise."  Id.  A duty of care does not extend to relationships involving sophisticated parties negotiating at arms length to further their own individual interests.  Id. at 819 (citing Fry v. Mount, 554 N.W.2d 263, 266 (Iowa 1996) (refusing to recognize claim for negligent misrepresentation where employee and employer "were dealing at arm's length" and "[t]he relationship was 'adversarial' in nature, not advisory.")).  Here, Skybridge was not acting in an advisory capacity to Aulick.  Rather, in discussing Aulick's potential promotion, Skybridge was acting in the company's interests and Aulick was acting in his self-interest.  Additionally, neither party had superior knowledge as to whether external candidates would apply for the CTO position and what the qualifications, if any, of those candidates would be.  Thus, no legally recognizable duty of care existed.

Moreover, even if this threshold requirement was met, Aulick cannot satisfy the second and third elements of negligent misrepresentation.  As discussed above, Skybridge did not falsely promise it would promote Aulick, and Aulick's reliance on Skybridge's statements was not justifiable.  Therefore, Skybridge is entitled to summary judgment on Aulick's negligent misrepresentation claim.

**G.  Motion to Strike**

Aulick moves to strike portions of Skybridge's reply brief as well as the Second Declaration of Ryan R. Kuhlmann [Docket No. 32] submitted in connection with the reply brief. However, in concluding that Skybridge is entitled to summary judgment on all claims, the Court did not consider or rely on the materials and arguments that Aulick seeks to strike.  Therefore, the motion to strike is denied as moot.

## IV.  CONCLUSION

Based upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion for Summary Judgment [Docket No. 17] is **GRANTED**; and

2. Plaintiff's Motion to Strike [Docket No. 33] is **DENIED** as moot; and

3. The Complaint [Docket No. 1] is **DISMISSED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  May 10, 2016.